No. 00-247

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 126

IN THE MATTER OF A.C.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

Honorable G. Todd Baugh, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Bruce J. Allison, Allison Law Office, Billings, Montana

For Respondent:

Honorable Joseph P. Mazurek, Attorney General; John Paulson,

Assistant Attorney General, Helena, Montana

Dennis Paxinos, County Attorney; Melanie Logan, Deputy County

Attorney, Billings, Montana

Patrick E. Kenney, Attorney at Law, Billings, Montana

(Guardian Ad Litem)

Submitted on Briefs: March 22, 2001
Decided: July 24, 2001

Filed:

_____

Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Claudia B. (Claudia) appeals from the Findings of Fact, Conclusions of Law and Judgment entered by the Thirteenth Judicial District Court, Yellowstone County, terminating her parental rights to A.C. and awarding permanent care, custody and control with authority to assent to adoption to the Montana Department of Public Health and Human Services (DPHHS). We affirm.

¶2 We rephrase the issues on appeal as follows:

¶3 1. Did the District Court err in concluding that the treatment plan task which required Claudia to provide a reasonable and consistent explanation for A.C.'s injuries was an appropriate task, and in denying Claudia's motion to strike the task?

¶4 2. Did the District Court err in determining that the criteria set forth in § 41-3-609, MCA, were met?

¶5 3. Did the State commit prosecutorial misconduct by seeking to have Claudia deported in violation of her constitutional rights to due process?

*BACKGROUND*

¶6 Claudia and Richard are the natural parents of A.C., born on August 4, 1997. Richard is a United States citizen, but Claudia is a citizen of Mexico, where she lived until she was 16 years old. Richard was 18 years old and Claudia was 20 years old at the time these proceedings were initiated. Both have limited English skills and a court-appointed Spanish interpreter was used during all hearings and informal interviews with the parents.

¶7 On January 2, 1998, Claudia and her sister-in-law, Ramona, took A.C. to the emergency room at Saint Vincent Hospital in Billings, Montana, complaining that A.C.

was fussy, had a fever, and had several marks on her skin. Claudia and Ramona initially reported the marks as a skin rash or allergic reaction attributed to diet because Claudia had recently changed A.C.'s formula and given her chicken noodle soup.

¶8 Dr. Douglas Parker, treating emergency room physician, examined A.C. and determined that the multiple markings on the child's body, thought by her mother to be a rash, were actually bruises and that A.C. was in a great deal of pain and appeared to have several broken ribs. Dr. Parker initially believed some of the bruises were caused by an adult human hand and later concluded the injuries were due to A.C. being handled forcibly by an adult. A.C. was admitted to Saint Vincent Hospital for further testing, examination and X-rays. Dr. Gordon Collette, a pediatrician, examined the infant and determined that she had eleven separate bruises, including a large bruise on her left jaw, multiple bruises on her back and chest, and a bruise on her left knee. Dr. Collette also determined that A.C. had four to seven broken ribs and a cellular compression injury to her liver. Drs. Parker and Collette agreed that injuries on A.C.'s chest and back were consistent with her having been squeezed by an adult and the bruises on her jaw were consistent with forceful compressions from an adult hand.

¶9 Upon A.C. being admitted, hospital personnel contacted DPHHS and the Billings Police Department. DPHHS social worker Roxanne Roller and a Billings police officer interviewed both parents. Claudia volunteered that A.C. had fallen out of her walker four days earlier and suggested the accident was the cause of her injuries. Roller testified that Claudia expressed shock and disbelief when told that A.C.'s injuries appeared to have been caused from squeezing but could not offer an explanation. A.C. was taken into the custody of Child Protective Services and both the police department and DPHHS initiated investigations into the cause of A.C.'s injuries.

¶10 As a result of the criminal investigation, Richard and Claudia were charged and convicted of misdemeanor endangering the welfare of children on October 23, 1998. DPHHS filed a Petition for Temporary Investigative Authority and Emergency Protective Services (TIA) on January 5, 1998. On January 13, 1998, the District Court adjudicated A. C. a youth in need of care and scheduled a show cause hearing which was continued by stipulation of the parties until March 2, 1998. The District Court took extensive testimony over three days between March 2 and April 20, 1998, regarding A.C.'s injuries and the events surrounding her January 2, 1998, hospitalization.

¶11 Claudia testified that A.C. sustained bruises to her forehead, knee and chin and an

injury to her gums when she fell out of her walker on December 28, 1997, but that she and Richard decided not to seek medical attention. Ramona, A.C.'s regular babysitter, cared for the child while Claudia was at work on December 29 through December 31, 1997. All witnesses agreed that A.C. had no new injuries and was behaving normally when she left Ramona's care on the afternoon of December 31. Claudia and Richard took care of A.C. either individually or together all day January 1, and most of January 2, 1998. During the late afternoon of January 2, Claudia went shopping with her mother and left A.C. in Ramona's care. At that time, it was immediately evident to Claudia's mother that A.C. was uncomfortable, crying and moaning, that she appeared to be gasping for breath and that her eyes were red and swollen. When the women returned from shopping, Ramona and Claudia's mother convinced Claudia to take A.C. to the emergency room.

¶12 Dr. John Sauer, a pediatrician and child abuse expert, testified regarding his examination of A.C. and her medical records in late January. Dr. Sauer ruled out a genetic or medical condition as the causality and opined that it was impossible for A.C.'s injuries to have been accidental. Rather, he stated his belief that the injuries were likely caused by someone squeezing the child. He also stated that A.C.'s injuries were acute and life-threatening. Dr. Sauer met with the parents after examining A.C. to explain the injuries and to stress their seriousness. He testified that, when he explained the nature of A.C.'s injuries to Claudia, she did not give any outward sign that she accepted the severity of the injuries or any indication that she understood someone was culpable for them. In that vein, Dr. Sauer also noted that children who have been abused are statistically more likely to be abused again if the parents are unable to explain the child's injuries and do not seek an explanation.

¶13 At the TIA hearing, Claudia was unable to express a belief that the baby had been injured and had broken bones as a result of abuse, even after discussing the matter with Dr. Sauer and hearing his testimony. The District Court found the following excerpts from Claudia's testimony illustrative:

> Q. [Claudia], are you telling the Court today that you do not know how [A.C.] fractured four ribs?
>
> A. I don't know anything. Had I seen it, I would have reported it.
>
> . . .

Q. Do you know how the . . . what is your understanding of how these injuries occurred?

A. I thought the baby had fallen off the walker, but everybody is saying that somebody injured the baby.

Q. Did you know that these injuries to your baby were caused by squeezing?

A. I don't understand why that comes up. I can't understand why, especially being so little.

. . .

Q. Do you believe your baby had broken bones?

A. I am thinking, and I can't believe that nobody would do something like that to - to a baby, but now - now I believe it, maybe.

. . .

Q. Do you believe she was beaten?

A. That's why she was taken away from me because she was beaten, but I don't know who did it.

Q. Not asking if you knew who did it; I'm saying, do you believe that she was beaten?

A. I don't know.

. . .

Q. When did you give [A.C.] the chicken noodle soup?

A. Thursday - no, Friday?

Q. Do you still believe that was the cause of the marks on her?

A. I don't know.

Q. You heard Dr. Sauer say they were bruises correct?

A. (Nod of head.) Yes.

Q. Do you believe or not believe that?

A. (Crying.) I don't believe that nobody would do such a thing like that to such a small child.

Claudia also expressed her belief that Richard could not have injured A.C. Though he did not testify at the TIA hearing, Richard also denied injuring A.C. in statements given to DPHHS and the police. However, neither parent offered another plausible explanation for A.C.'s injuries. The parties subsequently stipulated to the TIA on May 27, 1998, and the District Court entered an order granting DPHHS temporary investigative authority on June 10, 1998. On the basis of the TIA testimony, the District Court later determined that either Claudia or Richard caused A.C.'s injuries and that one or both of them was not being truthful.

¶14 DPHHS developed four treatment plans with Claudia between February 10, 1998, and July 1, 1999. Though Claudia signed only the third and fourth plans, all four were approved by the District Court. The purpose of all four treatment plans was to return A.C. to her parents' custody. All four plans sought to enable both parents to provide a safe, stable and nurturing environment for A.C., to enable them to develop an awareness of A.C.'s needs and an ability to meet those needs, to enable them to develop minimal parenting skills, and to resolve the issues that led to A.C.'s abuse. Incident to the latter goal, all four plans required the parents to provide a reasonable and consistent explanation for A.C.'s injuries. Over the course of these treatment plans, Claudia was consistently unable to offer a plausible explanation for A.C.'s injuries despite continued insistence by the District Court and Social Worker Roller as to the importance of this task to her parental treatment plans.

¶15 Richard and Claudia married during the pendency of the TIA proceeding, but they separated in July 1998. Claudia reported to Roller that she believed Richard was having an affair and that he had been physically violent with her. Richard also told Roller that Claudia had been violent in the past. On August 23, 1998, Claudia confronted Richard at

his home in the early morning hours where he was drinking with a male friend and three women. An argument and altercation ensued, which resulted in Claudia breaking a window with her fist and Richard being charged and convicted of assaulting Claudia.

¶16 On September 4, 1998, DPHHS determined that Claudia and Richard had failed to complete their treatment plans and filed a Petition for Custody, Termination of Parental Rights and Right to Consent to Adoption. The District Court heard testimony on the petition over eight separate days between May 11 and December 20, 1999, in addition to considering testimony introduced during the TIA hearings. On April 8, 1999, Claudia's court-appointed attorney filed a motion to strike the task in the ongoing treatment plan which required her to provide a reasonable and consistent explanation for A.C.'s injuries. The District Court subsequently denied the motion in its findings of fact and conclusions of law.

¶17 Claudia testified on August 2, 1999. She was then arrested for deportation proceedings, but was allowed to return to offer rebuttal testimony on December 20, 1999. On both occasions, she remained unwilling or unable to address A.C.'s abuse, except to disavow any knowledge of how the child was injured. During her testimony on the permanent custody petition, Claudia stated that she had gone to Kentucky Fried Chicken in the morning on the day A.C. was taken to the hospital, leaving the baby alone with Richard. Claudia did not relate this particular fact in her earlier statements or TIA testimony, but mentioned it for the first time in the criminal proceeding, ten months after her initial statements. Moreover, Claudia's account of the Kentucky Fried Chicken trip was contradicted by the testimony of Richard and Jose Guevera, a friend who accompanied Richard to the mall on that day.

¶18 Roxanne Roller and Sarah Blackburn, the two social workers involved with this case, both testified that the parents were only minimally cooperative with the DPHHS investigation and treatment plans. Roller testified further that neither parent ever satisfactorily addressed the abuse issues that led to A.C.'s hospitalization. The District Court also heard additional medical testimony regarding the severity and cause of A.C.'s injuries. In particular, Dr. Richard Lewallen, an orthopedic surgeon, testified that the ribs of a four-month-old infant are soft and pliable and, therefore, significant force is needed to break them. He opined that A.C.'s injuries were not caused by a fall from a walker but that she was likely squeezed or shaken forcefully by an adult. Dr. Lewallen testified further that A.C. would likely have been experiencing irritability and discomfort from such severe injuries which the parents should have noticed immediately upon handling her.

¶19 On January 31, 2000, the District Court entered extensive findings of fact and conclusions of law. In sum, the court found that Claudia allowed A.C. to incur life-threatening injuries, failed to recognize that A.C. was suffering severe injuries and immediately seek medical attention, failed to appreciate the severity of A.C.'s injuries, and failed to discover and offer a plausible explanation for A.C.'s injuries. Based upon its findings, the court concluded that A.C. was likely to be injured again if left in her parents' care and that termination of the parent-child relationship was in A.C.'s best interest. The District Court then entered a separate judgment terminating Claudia and Richard's parental rights and granting permanent legal custody of A.C. to DPHHS. Claudia appeals.

*STANDARD OF REVIEW*

¶20 "In reviewing a decision to terminate parental rights, this Court determines whether the district court's findings of fact supporting termination are clearly erroneous and whether the district court's conclusions of law are correct." *In re B.F.*, 2000 MT 231, ¶ 7, 301 Mont. 281, ¶ 7, 8 P.3d 790, ¶ 7 (citations omitted). "A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or if, after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake." *In re J.N.*, 1999 MT 64, ¶ 11, 293 Mont. 524, ¶ 11, 977 P.2d 317, ¶ 11. It is well-established that a natural parent's right to care and custody of her child is a fundamental liberty interest which must be protected by fundamentally fair procedures. *See, e.g., In re B.F.*, ¶ 7; *In re A.N.*, 2000 MT 35, ¶ 24, 298 Mont. 237, ¶ 24, 995 P.2d 427, ¶ 24; Accordingly, in regard to the statutorily-required findings supporting termination of parental rights, we have stated that the burden is on the party seeking termination to demonstrate by clear and convincing evidence that every requirement set forth in the statute has been satisfied. *In re B.F., ¶* 7. Finally, we review a trial court's evidentiary rulings to determine if the court abused its discretion and we "will not reverse evidentiary rulings absent a manifest abuse of discretion." *Inquiry into M.M.* (1995), 274 Mont. 166, 169, 906 P.2d 675, 677 (citations omitted).

*DISCUSSION*

¶21 **1. Did the District Court err in determining that the treatment plan task which required Claudia to provide a reasonable and consistent explanation for A.C.'s injuries was an appropriate task, and in denying Claudia's motion to strike the task?**

¶22 Claudia's challenge to the District Court's decision terminating her parental rights

focuses on the court's reliance on § 41-3-609(1)(e), MCA (1997). Section 41-3-609(1)(e), MCA (1997), authorizes a court to terminate the parent-child relationship if the child is an adjudicated youth in need of care and both of the following exist:

> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time[.]

¶23 All four parenting treatment plans included some version of the following task: "Claudia . . .will provide an explanation to the Social Worker for the injuries to [A.C.] which is <u>reasonable and consistent</u> with those injuries." (Emphasis in treatment plan.) Claudia noted her objection to the task on the fourth treatment plan and, prior to the permanent custody hearing, she filed a motion to strike the task as inappropriate.

¶24 Relying on the testimony of Dr. Sauer, the District Court found that a child under A. C.'s circumstances-who has been seriously injured and is returned to a home where there has been no attempt to discover and explain the cause of such injuries and where there is evidence of family violence-faces a greater than 50 percent likelihood of being seriously injured again. Based on this finding and evidence of incidents of domestic violence between Claudia and Richard, the District Court found as follows:

> This task is clearly reasonable and appropriate. Without an adequate explanation for how and why this child was injured, no amount of services will guarantee that the child will not be physically abused again. An understanding of the reasons why this occurred in the first place is necessary before the issues leading to such abuse can be resolved. When, as here, the parents refuse to acknowledge such injuries, and attempt to protect themselves and others by refusing to offer an explanation, the parents are not putting the child's safety first and foremost.

Based on its findings of fact, the court went on to conclude the treatment plans created by DPHHS were appropriate as a matter of law. Claudia argues the court erred when it determined that the treatment plan task requiring her to explain A.C.'s injuries was appropriate.

¶25 As a preliminary matter, Claudia argues the District Court erred by failing to strike the

disputed treatment plan task pursuant to Uniform District Court Rule 2. That rule provides, in part, that failure to file a brief in response to a motion shall be deemed an admission by the non-moving party that the motion is well-taken. In the present case, the State never filed a brief in response to Claudia's motion to strike. According to Claudia, the District Court should have granted her motion upon expiration of the filing deadlines provided in Uniform District Court Rule 2. We disagree. We have interpreted Uniform District Court Rule 2 as allowing the trial court discretion to either grant or deny an unanswered motion. *State v. Loh* (1996), 275 Mont. 460, 466, 914 P.2d 592, 596. Thus, it was within the sound discretion of the District Court to deny Claudia's motion. We turn, then, to the court's underlying determination that the disputed treatment task was appropriate.

¶26 This Court has declined to specifically define what constitutes an appropriate treatment plan pursuant to § 41-3-609(1)(e)(i), MCA, because the unique circumstances existing in each case defy a bright line definition. *See, e.g., In re A.N.*, ¶ 26; *In re J.N.*, ¶ 16; *Matter of Custody and Parental Rights of M.M.* (1995), 271 Mont. 52, 56, 894 P.2d 298, 301. We have, however, routinely considered whether the parent was represented by counsel, whether the parent stipulated to the plan, and whether the plan takes into consideration the particular problems facing both the parent and the child. *In re A.N.*, ¶¶ 26-27; *In re J.N.*, ¶ 16; *Custody of M.M.*, 271 Mont. at 56-57, 894 P.2d at 301.

¶27 In the present case, Claudia was represented by counsel throughout the entire proceeding. Claudia also stipulated to the third and fourth treatment plans, though she noted her objection to the task requiring her to explain A.C.'s injuries on the fourth treatment plan and she later moved to strike the task. The thrust of Claudia's argument on appeal is that the disputed task placed her in the untenable position of having to choose between incriminating herself and failing to complete her treatment plan, thereby violating her constitutional privilege against self-incrimination.

¶28 Claudia relies on *In re A.N.* in arguing that the disputed treatment plan task impinged her privilege against self-incrimination. In that case, we considered a father's Fifth Amendment challenge to a parental treatment plan which required him to explain the cause of his child's injuries, assume responsibility for any injuries inflicted on the child, and cooperate with law enforcement to resolve criminal charges related to the child's injuries. *In re A.N.*, ¶ 30. We observed that the privilege against self-incrimination set forth in the Fifth Amendment to the United States Constitution protects an individual from being compelled to testify against himself or herself in a criminal or civil proceeding,

including a proceeding to terminate parental rights. *In re A.N.*, ¶¶ 34-36. We noted, however, that "testimony may be compelled . . . if the individual is given immunity for the incriminating testimony and the fruits of that testimony." *In re A.N.*, ¶ 33 (quoting *Lefkowitz v. Turley* (1973), 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d. 274). Because the treatment plan in *In re A.N.* required the father to incriminate himself in a separate criminal proceeding or face losing his parental rights, we concluded the plan violated his privilege against self-incrimination and was, therefore, inappropriate. *In re A.N.*, ¶¶ 36-38.

¶29 Claudia's reliance on *In re A.N.* is misplaced. First, unlike *In re A.N.*, Claudia does not argue that her treatment plans required her to confess to causing A.C.'s injuries or cooperate with law enforcement to resolve the criminal charges against her. Indeed, she was convicted of the criminal charges despite her failure to complete the disputed task. Thus, the criminal charges against her were resolved notwithstanding the requirements of her treatment plan.

¶30 Second, Claudia concedes on appeal that she testified voluntarily regarding her knowledge of the cause of A.C.'s injuries at the TIA hearing and the permanent custody hearing as well as during the criminal proceeding. It is well-established that a defendant who chooses to testify waives her privilege against compelled self-incrimination with respect to the subject of her testimony. *See State v. Van Dyken* (1990), 242 Mont. 415, 430-31, 791 P.2d 1350, 1360 (citing *Harrison v. United States* (1968), 392 U.S. 219, 222, 88 S. Ct. 2008, 2010, 20 L.Ed.2d 1047). Both the TIA hearing and the criminal proceeding took place prior to Claudia's objection to the disputed task. Although the thrust of this earlier testimony was that she did not know how the child sustained the life-threatening injuries, she nonetheless testified voluntarily and with the advice of counsel about the issue. In so doing, Claudia waived her privilege against self-incrimination as to any future testimony explaining those injuries and cannot now claim that the explanation task impinged upon that privilege.

¶31 Finally, despite the waiver of her self-incrimination privilege, Claudia was offered immunity by the District Court for any further explanation of A.C.'s serious injuries. Pursuant to *In re A.N.*, this offer of immunity also operated to remove any Fifth Amendment issue from Claudia's parental treatment plan. *In re A.N.*, ¶ 33. While Claudia concedes on appeal that she was offered immunity for the fruits of any further explanation of A.C.'s injuries, she asserts the offer of immunity was "an empty promise" with regard to the criminal child endangerment charge against her because she had already been convicted in justice court. This assertion is without merit. Claudia was convicted in justice

court prior to objecting to the disputed task. The offer of immunity would have prevented the use of any further explanation Claudia had offered about the child's serious injuries in the appeal of her criminal conviction-then pending in district court-or in any subsequent proceedings based upon the evidence, such as a perjury charge arising out of her earlier inconsistent testimony. Thus, the offered immunity was not an empty promise and further removed the Fifth Amendment issue from the treatment plan in accordance with *In re A.N.* Having failed to demonstrate some threat of incrimination, Claudia cannot establish the disputed task impinged her privilege against self-incrimination.

¶32 Claudia also argues that the disputed task was unfair because she did not know how A.C.'s injuries occurred. She claims that by including this task in the treatment plan, DPHHS made it impossible for her to complete the plan and, therefore, ensured termination of her parental rights. While the difficulty of the position Claudia asserts is apparent, her argument disregards the purpose of the treatment plan and the disputed task. The State became involved in the present case because a four-month-old infant suffered life-threatening injuries while she was under her parents' care. Claudia denied injuring the child, expressed her belief that Richard did not injure the child, and offered wholly implausible explanations for the injuries. The disputed task in the present case merely required that Claudia demonstrate an understanding that her baby could not have received seven broken ribs and a liver injury by simply falling out of a walker and that she attempt to discover how those injuries occurred. The State's duty to protect children, as set forth in § 41-3-101, MCA (1997), necessitates that the parent of an abused child be required to come to terms with how and why the child was abused while in the parent's care. Without demonstrable willingness from Claudia to resolve the abuse issues that led to A.C.'s injuries, the District Court had no assurance that A.C. would not be abused again.

¶33 In sum, we conclude Claudia has not demonstrated that the task in her parental treatment plan requiring her to provide a reasonable and consistent explanation for A.C.'s injuries violated her privilege against self-incrimination. We further conclude that the explanation task was a fair requirement in the treatment plan under these circumstances. Thus, we hold the District Court was correct as a matter of law when it concluded that Claudia's parental treatment plan was appropriate. We further hold, therefore, that the District Court did not abuse its discretion when it denied Claudia's motion to strike the treatment plan task requiring her to explain A.C.'s injuries.

¶34 **2. Did the District Court err in determining that the criteria set forth in § 41-3-609, MCA, were met?**

¶35 Having determined that Claudia's treatment plan was appropriate, the District Court determined, pursuant to § 41-3-609(1)(e)(i) and (ii), MCA (1997), that Claudia had failed to comply with the task requiring her to offer a reasonable and consistent explanation for A.C.'s injuries and that the conduct rendering Claudia unfit was unlikely to change within a reasonable time. Claudia argues the District Court erred in determining that the statutory criteria were met because the court's determinations are not supported by clear and convincing evidence. We disagree.

¶36 We pause here, to clarify our standard of review in parental termination cases. As noted above, it is well-established that the State has burden of proving the statutory criteria supporting termination are met by clear and convincing evidence. *See In re B.F.,* ¶ 7. In *In re B.F.*, however, we went on to state: "Therefore, a finding that a statutory requirement has been satisfied is clearly erroneous if it is not supported by clear and convincing evidence." *In re B.F.,* ¶ 7. This is an incorrect statement of our standard of review. This Court reviews a district court's findings that the statutory criteria supporting termination are met to determine whether those findings are clearly erroneous--that is, whether they are supported by substantial evidence, whether the district court misapprehended the effect of the evidence, or whether this Court is left with a definite and firm conviction that the district court made a mistake. *See, e.g., In re J.N.,* ¶ 11; *In re M.A. E.*, 1999 MT 341, ¶ 17, 297 Mont. 434, ¶ 17, 991 P.2d 972, ¶ 17; *In re E.W.*, 1998 MT 135, ¶ 10, 289 Mont. 190, ¶ 10, 959 P.2d. 951, ¶ 10. We therefore overrule our decision in *In re B.F.*--as well as subsequent decisions that followed *In re B.F.*--to the extent that it suggests we should review a district court's findings in a parental termination case to determine whether they are supported by clear and convincing evidence.

¶37 Claudia testified on three occasions over the course of this two-year proceeding and gave numerous other statements regarding A.C.'s injuries. Initially, Claudia stated that she believed the marks on A.C. to be a rash or an allergic reaction or possibly bruises from falling out of her walker. In response to repeated questioning by attorneys and the court, she maintained incredulity that someone could have squeezed A.C. to the point of fracturing the baby's ribs and damaging her liver. However, she remained unable to offer any other plausible explanation, despite the fact that she and Richard were A.C.'s only care-takers during the two days preceding her injuries. Moreover, the District Court found Claudia's demeanor misleading and her overall testimony to be inherently inconsistent and in conflict with other evidence. Specifically, the court found Claudia's change in testimony regarding her trip to Kentucky Fried Chicken on the day A.C. was hospitalized to be disingenuous.

¶38 The District Court also heard the testimony of numerous health professionals regarding their efforts to resolve A.C.'s situation. Social Worker Roller testified that all four of Claudia's treatment plans contained the explanation task. Roller stated that she explained to Claudia the importance of coming to terms with the injuries several times but that Claudia was unable or unwilling to acknowledge that her child had been abused. Roller also stated that, over the course of this proceeding, Claudia made only minimal progress meeting her treatment goals. Social Worker Sarah Blackburn testified that both Claudia and Richard were minimally cooperative throughout the DPHHS investigation. Dr. Sauer, the State's child abuse expert, testified that Claudia seemed unable to recognize the severity of the injuries or the importance of determining causality. Finally, the District Court heard testimony of three doctors in addition to Dr. Sauer which established that A. C. suffered acute, life-threatening injuries as a result of being forcibly squeezed by an adult.

¶39 On the basis of this evidence, and after two years of trying unsuccessfully to resolve the abuse issues that led to A.C.'s injuries, the District Court found that "the parents have both steadfastly maintained ignorance as to how [A.C.] was injured." The court then concluded, pursuant to § 41-3-609(1)(e)(i), MCA (1997), that the treatment plans "were not complied with and were not successful." Turning to § 41-3-609(1)(e)(ii), MCA (1997), the court found as follows:

> Under the best of circumstances, it would be unlikely that these parents could ever adequately parent this badly abused and neglected child. They have repeatedly shown by their words and actions that they are willing to sacrifice this infant's best interests in order to preserve their own parental interests.

The court then concluded that "Claudia's conduct and condition has not improved over the past two years and are unlikely to change within a reasonable time."

¶40 After careful review of this record, we hold that substantial evidence supports the District Court's findings that Claudia's treatment plan was not complied with or successful and that the conduct and condition rendering Claudia unfit are unlikely to change within a reasonable time and the findings are not otherwise clearly erroneous. Consequently, we hold the District Court was correct when it determined that the criteria set forth in § 41-3-609(1)(e)(i) and (ii), MCA (1997), were met and, therefore, that termination of Claudia's parental rights was proper.

**¶41 3. Did the State commit prosecutorial misconduct by seeking to have Claudia deported in violation of her constitutional rights to due process?**

¶42 Claudia finally argues that someone representing the State in the permanent custody proceeding-either the deputy county attorney or one of the DPHHS social workers, or both- improperly summoned a federal Immigration and Naturalization Services (INS) agent to the permanent custody hearing on August 2, 1999-at which Claudia testified-with the intent of facilitating Claudia's deportation. Claudia asserts that her due process rights were violated because the INS agent arrested her after she was finished testifying in full view of the District Court. She contends that her arrest in open court raised the suspicion of criminal activity, thereby prejudicing the fact-finder against her. She contends further that she was denied due process when she was taken into INS custody because she was precluded from attending the rest of the permanent custody hearing.

¶43 Claudia's argument that the State committed prosecutorial misconduct is without merit. In her brief, Claudia makes a vague reference to § 45-7-206(1), MCA, Montana's witness tampering statute, apparently suggesting that the deputy county attorney and/or Social Worker Roller illegally induced Claudia's absence from the proceeding. The record does not support any such assertion. Jerome Pawluk, the INS agent who arrested Claudia, testified at the permanent custody hearing subsequent to Claudia's arrest. Agent Pawluk testified that Claudia was in the country illegally; that INS had been aware of her since 1995; and that INS became aware of the present youth in need of care proceeding independent of any communication with the Yellowstone County Attorney's office or DPHHS. Indeed, Agent Pawluk stated that it was his decision to allow Claudia to participate in the proceeding before arresting her and that he initiated contact with the deputy county attorney and informed her that he would take Claudia into custody after she had finished giving testimony on August 2, 1999.

¶44 Moreover, Claudia provides no support for her contention that she was prejudiced when Agent Pawluk detained her in open court. Claudia does not argue that her citizenship status was improperly before the court. More importantly, Claudia does not suggest-and the record does reveal-that the District Court's determination in this case was influenced at all by Claudia's citizenship status. On this record, we cannot conclude Claudia was prejudiced by the district court's awareness of her citizenship status or the fact that she was detained for deportation proceedings.

¶45 Claudia also fails to provide support for her contention that she was denied due

process when she was precluded from being present for the testimony presented on August 5, 1999. We reiterate here that parental rights constitute a liberty interest which must be protected by fundamentally fair procedures. *See In re B.F.*, ¶ 7. In the present case, however, Claudia gave testimony at the TIA hearing and the permanent custody hearing, was represented by counsel throughout the entire proceeding, and was present for the entire proceeding except the hearing on August 5, 1999. The INS released Claudia on bond pending the outcome of this proceeding and the District Court allowed her to give rebuttal testimony on December 20, 1999. Claudia provides no legal authority for her assertion that the right to fundamentally fair procedures required the District Court to stay the proceeding until she was able to attend. Thus, we hold the State did not commit prosecutorial misconduct violation of Claudia's constitutional rights to due process.

¶46 Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

Justice Jim Regnier dissents.

¶47 I respectfully dissent to the Court's conclusion that the treatment plan adopted in this case was appropriate under the circumstances. We acknowledged in our recent decision, *In re A.N.,* 2000 MT 35, that there is no bright line definition of what is an appropriate treatment plan adopted pursuant to § 41-3-609(1)(f)(i), MCA. We recognized that each case is unique - as is this case.

¶48 There is no question that the injuries to A.C. were life threatening and extremely serious. Certainly our courts and agencies must protect infants such as A.C. for all the obvious reasons. However, I am convinced that the provision in the treatment plan that required Claudia to provide a reasonable and consistent explanation for A.C.'s injuries was

not only inappropriate, but actually assured that Claudia would be unable to successfully complete the plan. If Claudia was unaware of how her child sustained the serious injuries, it was impossible for her to provide an explanation for A.C.'s injuries that was different than the one she consistently repeated: she did not know who inflicted the injuries to A.C.

¶49 The Court fails to adequately recognize the impossible burden that was placed on Claudia. The majority notes that " [t]he disputed task in the present case merely required that Claudia demonstrate an understanding that her baby could not have received seven broken ribs and a liver injury by simply falling out of a walker and that *she attempt to discover* how those injuries occurred." (Emphasis added.) On the contrary, the four treatment plans specifically required the parents to provide *a reasonable and consistent explanation* for A.C.'s injuries. Merely attempting to discover how the injuries occurred would not suffice for compliance with the treatment plan. Claudia consistently testified that she did not know how A.C. received such severe injuries. By including a requirement in the treatment plan that compelled Claudia to provide an explanation for the injuries that most probably were inflicted by someone other than herself and outside of her presence, she was presented with no opportunity to successfully complete the plan.

¶50 I recognize that a child should not be placed at risk by returning the child to an environment where that child is likely to be exposed to serious bodily injury. It seems to me, however, that other precautions and conditions could have been incorporated into a treatment plan to protect this child and provide Claudia an opportunity to continue in a parental relationship. The focus of any treatment plan is on future conduct. Claudia should not have been required to do the impossible in order to retain her parental rights.

¶51 I would reverse the order of the District Court terminating Claudia's parental rights to A.C.

/S/ JIM REGNIER

Justices Terry N. Trieweiler and Patricia Cotter join in the foregoing dissent.

/S/ TERRY N. TRIEWEILER

/S/ PATRICIA COTTER