

DA 09-0476

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 130N

IN THE MATTER OF:

Z.J., N.L., and B.S.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DN 06-12
Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Joslyn Hunt, Chief Appellate Defender; Lisa B. Kauffman, Assistant
          Appellate Defender; Missoula, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General; Micheal S. Wellenstein,
          Assistant Attorney General; Helena, Montana

          Thomas P. Meissner, Fergus County Attorney; Lewistown, Montana

                  Submitted on Briefs:  March 24, 2010

                          Decided:  June 8, 2010

Filed:

          _____
                          Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, as amended in 2006, the following decision shall not be cited as precedent.  It shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2    Appellant C.C. appeals from the decision of the Tenth Judicial District Court, Fergus County, terminating her parental rights with respect to her three children B.S., N.L., and Z.J.  We affirm.

¶3    We restate the issues on appeal as follows:

¶4    *1. Whether the children's statutory rights to counsel were violated.*

¶5    *2. Whether the District Court erred in terminating C.C.'s parental rights.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶6    C.C. is the mother of B.S., N.L., and Z.J., all three of whom have been living in foster care since 2006.  The parental rights of each child's father, respectively T.S., C.L. and D.J., have been terminated.  Each of C.C.'s partners and the fathers of each of her children have been abusive and physically violent toward both C.C. and the children.

¶7    The Department of Public Health and Human Services, Child and Family Services Division (Department) first became involved with C.C. and her children in 2000 when C.L., the father of N.L., injured N.L.  At that time, the Department obtained legal custody

2

of the children and removed them from C.C.'s care. After working on a treatment plan, the Department returned the children to C.C. In 2004, the Department intervened again when "the children disclosed abusive acts by [D.J.]" (the father of Z.J.) and it became clear that D.J. was using drugs and alcohol around the children and that C.C. was failing to protect the children from D.J. Once more, the Department obtained temporary legal custody of the children. This time however, rather than removing the children from C.C.'s care, the Department removed D.J. from the home and ordered C.C. and D.J. to work on another treatment plan. During this time, D.J. was only to be in the home during supervised visits.

¶8 In February 2006, B.S. reported to a teacher that D.J. was back in the home and that the children were afraid. B.S. requested the Department have D.J. removed from the home. B.S. further explained to a Department social worker that D.J. was staying at the house and "throwing things" at C.C. In response, the Department once again removed the children and placed them in foster care.

¶9 On March 7, 2006, the Department filed petitions for emergency protective services, adjudication as youths in need of care, and temporary legal custody for B.S., N.L., and Z.J. On March 8, 2006, the District Court granted the petitions and, on August 2, 2006, after conducting a hearing, declared B.S., N.L., and Z.J. youths in need of care.

¶10 On March 21, 2007, an order granting an extension of temporary legal custody was granted and a second treatment plan was approved. On September 7, 2007, the first

3

petition to terminate C.C.'s parental rights was filed. On February 6, 2008, the District Court ordered another extension of temporary legal custody and approved a third treatment plan. On June 13, 2008, the second petition to terminate C.C.'s parental rights was filed and on July 20, 2009, the District Court issued its order terminating C.C.'s parental rights.

¶11 C.C. appeals.

## STANDARD OF REVIEW

¶12 This Court reviews a district court's decision to terminate parental rights for abuse of discretion. *In re D.B.*, 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691. Because of the constitutional implications of terminating parental rights, a district court must make specific factual findings addressing the applicable statutory requirements. *In re D.B.*, ¶¶ 17-18. In termination proceedings, the burden is on the party seeking termination to demonstrate by clear and convincing evidence that each requirement set forth in the applicable statute has been satisfied. *In re A.C.*, 2001 MT 126, ¶ 20, 305 Mont. 404, 27 P.3d 960.

## DISCUSSION

¶13 *1. Whether the children's statutory rights to counsel were violated.*

¶14 On appeal, C.C. argues that the children's statutory rights to counsel were violated. She maintains that pursuant to § 41-3-425, MCA, the District Court was required to appoint counsel for the children in their § 41-3-422, MCA, abuse and neglect proceeding. The State counters that C.C. waived appellate review of her claim and that in

any event, any error was harmless. As the issue of waiver is a threshold matter, we turn first to whether C.C. has preserved her claim for appeal.

¶15 This Court will not consider theories or issues raised for the first time on appeal. *In re A.N.W.*, 2006 MT 42, ¶ 41, 331 Mont. 208, 130 P.3d 619. "In order to preserve a claim or objection for appeal, an appellant must first raise that specific claim or objection in the district court." *In re T.E.*, 2002 MT 195, ¶ 20, 311 Mont. 148, 54 P.3d 38.

¶16 Nevertheless, C.C. advocates invocation of the plain error doctrine arguing that, left unreviewed, the violation of the children's statutory rights to counsel will result in "a serious miscarriage of justice" and compromise the integrity of the judicial process. While C.C. is correct that § 41-3-425(1), MCA, provides a statutory right to counsel for "[a]ny party involved in a petition filed pursuant to 41-3-422" the mere fact that the children did not have separate counsel during this proceeding does not require that we invoke the plain error doctrine.

¶17 This Court will engage in plain error review and address an issue or claim not raised below "in those limited situations where the failure to review the claimed error may result in a manifest miscarriage of justice . . . ." *In re D.A. and M.A.*, 2008 MT 247, ¶ 33, 344 Mont. 513, 189 P.3d 631. However, "[a] mere assertion that failure to review the claimed error may result in a manifest miscarriage of justice . . . is not sufficient to implicate the plain error doctrine." *State v. Rovin*, 2009 MT 16, ¶ 29, 349 Mont. 57, 201 P.3d 780.

¶18 Here, C.C. has not presented any evidence to support her contention that the lack of counsel for the children influenced, in any way, the outcome of this case. Rather, C.C. has simply presented the law that gives rise to the statutory right and asserted that, even though she failed to raise this issue below, a manifest miscarriage of justice will occur if we do not review her claim. This is exactly the sort of broad unsupported assertion that we rejected in *Rovin*. In this instance, even if C.C. had preserved her claim, she can show no prejudice because the record here demonstrates that the alleged error was harmless and that the children's interests and desires were clearly addressed. *See In re D.B.*, 2008 MT 272, ¶ 38, 345 Mont. 225, 190 P.3d 1072 (explaining that "no civil case shall be reversed by reason of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless.").

¶19 In its order terminating C.C.'s parental rights, the District Court noted that the children loved their mother and wished to maintain contact with her. Furthermore, while it is true that the children were not explicitly provided with counsel, the guardian ad litem was himself an attorney whose statutory duty as a guardian ad litem included "assert[ing] the child[ren]'s rights" and "represent[ing] . . . the child[ren]'s best interests . . . ." Section 41-3-112, MCA. Indeed, pursuant to these duties, the guardian ad litem advocated for a guardianship rather than termination of parental rights and filed proposed findings of fact and conclusions of law on behalf of the children. Finally, regardless of whether the children had counsel, the fact remains that C.C. failed to complete three

6

court-approved treatment plans, repeatedly exposed the children to abusive men and had not progressed sufficiently so as to safely parent the children.

¶20 Simply put, aside from C.C.'s broad assertions, there is no indication that, without review, a manifest miscarriage of justice will occur. Accordingly, we conclude that C.C. failed to preserve her claim that the children should have been appointed counsel. Given the lack of a showing that a manifest miscarriage of justice will occur absent review, invocation of the plain error doctrine is not appropriate in this instance.

¶21 *2. Whether the District Court erred in terminating C.C.'s parental rights.*

¶22 C.C. argues that the District Court made several mistakes in terminating her parental rights. First, she makes the broad argument that parental rights may not be terminated based on another adult's victimization of that parent. Pointing to the abuse she suffered at the hands of her partners, C.C. argues that the District Court's termination of her rights wrongly punished her for being a victim of domestic abuse. Second, C.C. contends that the treatment plans, which she consented to and which the District Court approved, were inappropriate because they lacked specific deadlines, did not take into consideration C.C.'s special needs and disabilities and did not take into consideration the particular problems facing C.C. and the children. C.C. maintains that the District Court erred by improperly finding that her conduct rendered her unfit, unable or unwilling to give her children adequate parental care.

¶23 The State counters, arguing once more that C.C. failed to preserve her claim that her rights were wrongfully terminated because she was a victim of domestic violence. In

the alternative, the State addresses the merits of C.C.'s claims and argues that the District Court properly terminated C.C.'s rights, not for being a victim of domestic violence, but for repeatedly exposing her children to the dangers inherent in the numerous violent relationships she maintained.

¶24 Turning to the threshold issue of waiver, we begin by noting that while it is true that the first issue C.C. presents on appeal, "whether a victim of domestic violence should have her parental rights terminated based on another adult's victimization of her," was not explicitly raised below, we reject the State's conclusion that this failure is tantamount to waiving her appeal as to the propriety of the District Court's termination of her parental rights. In this instance, while C.C. does make the broad and unpreserved claim that her rights were terminated for being the victim of domestic violence, her underlying arguments are that the treatment plans were inappropriate and that the District Court wrongly concluded her conduct or condition rendered her unfit, unable or unwilling to give the children adequate parental care. C.C. explicitly made all of these contentions during the District Court proceedings below.[1] Accordingly, we conclude that C.C.'s arguments relating to the treatment plans and to whether the District Court erred in determining that her conduct or condition was unlikely to change within a reasonable time were preserved and thus, are properly made on appeal.

---

[1] C.C.'s proposed findings of fact and conclusions of law, which she presented to the District Court, explicitly contend that the treatment plans were inappropriate and that "the Department has failed to establish by clear and convincing evidence that the conduct or condition rendering the natural mother unfit is unlikely to change within a reasonable time."

8

¶25 As it applies to the case before us, Montana law provides that a court may terminate parental rights upon clear and convincing evidence that: (1) the child has been adjudicated a youth in need of care; (2) an appropriate court-approved treatment plan has not been complied with by the parent or has not been successful; and (3) the conduct or condition rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f)(i)-(ii), MCA. In determining whether the conduct rendering a parent unfit is unlikely to change within a reasonable time, a district court must assess the past and present conduct of the parent. *In re A.S.*, 2006 MT 281, ¶ 48, 334 Mont. 280, 146 P.3d 778. As C.C. does not contest that the children have been adjudicated youths in need of care or that she failed to comply with the treatment plans, our first inquiry must be whether the court-approved treatment plans were appropriate.

¶26 C.C. maintains that the treatment plans were not appropriate because they lacked specific deadlines, did not take into account her special needs and learning disabilities, and did not address the particular domestic violence problems facing C.C. and the children. The State responds by pointing out that: (1) the plans had specific deadlines; (2) the plans and the Department provided sufficient services and professionals to address C.C.'s learning disabilities; and (3) the plans recognized and addressed the problems C.C. faced as a victim of domestic violence. Thus, the State concludes, the treatment plans were appropriate.

¶27 This Court has consistently declined to specifically define what constitutes an appropriate treatment plan because the unique circumstances existing in each case defy a

9

bright line definition. *See, e.g., In re A.C.*, 2001 MT 126, ¶ 26, 305 Mont. 404, 27 P.3d 960; *In re J.N.*, 1999 MT 64, ¶ 16, 293 Mont. 524, 977 P.2d 317; *In re M.M.*, 271 Mont. 52, 56, 894 P.2d 298 (1995). "We have, however, routinely considered whether the parent was represented by counsel, whether the parent stipulated to the plan, and whether the plan takes into consideration the particular problems facing both the parent and the child." *In re A.C.*, ¶ 26. As there is no dispute that C.C. was represented by counsel and, at least initially, agreed to and signed off on the treatment plans, we address first C.C.'s argument that the treatment plans lacked requisite deadlines.

¶28 The thrust of C.C.'s argument is essentially that the first two treatment plans, which included dozens of tasks, lacked specific deadlines and thus granted "unchecked discretion" to the Department in determining her compliance with the plans. In reviewing the plans however, we disagree and find no merit in C.C.'s contention that they inappropriately granted "unchecked discretion" to the Department.

¶29 C.C.'s first treatment plan stated that it covered "August 18, 2006 to February 13, 2007" while her second treatment plan covered "March 20, 2007 to September 16, 2007." Finally, the third treatment plan, in addition to having specific deadlines for each task, stipulated that it covered "January 8, 2008 [to] June 14, 2008." Furthermore, even assuming that the first two treatment plans were inappropriate because they lacked specific deadlines attached to each task, C.C.'s parental rights were not terminated until after she failed to comply with the third treatment plan—which clearly contained task-specific deadlines. Thus, to the extent the first two treatment plans failed to provide task

deadlines, C.C. was in no way prejudiced by this alleged error because the third treatment plan, which she also failed to comply with, clearly did.

¶30 C.C.'s next argument, that the treatment plans did not take into consideration her special needs or disabilities, is equally unpersuasive. Although the record indicates that C.C. is a concrete thinker and a "hands on learner," the treatment plans and the Department's professional services sufficiently provided C.C. with the opportunity to understand what was expected of her under each treatment plan. In addition to her several counselors, all of whom were available to help C.C. understand the treatment plans, C.C. also met with Department social worker Connie Sue Larson on a weekly basis and had access to her own attorney for any additional questions she may have had.

¶31 While it is true that the Department cannot "trap" a parent into a situation where it is not possible for that parent to successfully comply with a treatment plan, such is not the case here. C.C. had ample opportunity to engage with the numerous social service professionals she worked with throughout the course of her treatment plans. Accordingly, in this instance, we find no merit in C.C.'s argument that her learning disabilities or special needs were not appropriately addressed by the treatment plans and the Department's support system.

¶32 Finally, we turn to C.C.'s argument that the treatment plans did not address the particular domestic violence problems facing C.C. and the children. A brief review of the treatment plans demonstrates that each plan required, among other things, that C.C. obtain counseling on abusive relationships, as well as on her co-dependency and

11

personality disorders. In addition, the plans required that C.C.'s counseling address such things as learning how to see "red flags" of abusive relationships as well as how to protect herself and her children from abusive relationships. The plans also required that C.C. demonstrate her ability to choose her children and their needs over a male relationship. In addition to these tasks, the Department provided counseling to the children and a psychological evaluation of C.C. to determine if she had made significant progress on these goals. In sum, the treatment plans appropriately targeted the domestic violence problems facing C.C. and the children.

¶33 Thus, we conclude that the court-approved treatment plans provided appropriate deadlines, sufficiently accounted for C.C.'s special needs and addressed the particular problems facing C.C. and the children. The District Court did not abuse its discretion in finding that C.C. failed to successfully complete appropriate court-approved treatment plans.

¶34 As noted above, C.C. also argues that the District Court erred in determining that her conduct or condition rendered her unfit, unable or unwilling to give adequate parental care and was unlikely to change within a reasonable time. C.C. contends that "[t]he unintended consequences of the [district] court's conclusions sets a precedent that in the . . . homes where mothers are victims of domestic violence, all the children should be removed, and the mother's rights terminated . . . ." C.C.'s portrayal of the District Court's conclusions is not accurate.

¶35 It is well settled that determining whether the conduct or condition rendering a parent unfit is unlikely to change within a reasonable time "requires the court to assess past and present conduct of the parent." *See In re A.S.*, ¶ 48 (quoting *In re M.A.E.*, 1999 MT 341, ¶ 37, 297 Mont. 434, 991 P.2d 972). Furthermore, in considering whether the parent is unlikely to change within a reasonable time, "the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child." Section 41-3-609(3), MCA.

¶36 Here, the District Court concluded that "[t]he mother's ongoing and as yet unresolved psychological problems leading to harmful relationships with violent men are likely to persist, given the history of this case." Referencing the substantial testimony of experts concerning C.C.'s personality disorder, as well as her history and current involvement with violent men, the District Court determined C.C. to be "unfit, unable, or unwilling to give the child[ren] adequate parental care, and that the condition or conduct is unlikely to change within a reasonable time."

¶37 While the constitutional implications of fundamental parental rights require the State to meet a heavy burden before such rights can be terminated, the record here, including extensive testimony from C.C.'s counselors and social workers, demonstrates that after numerous opportunities to effectuate change, C.C. was unable to sufficiently provide the parental care the children needed. The District Court's conclusion does not, as C.C. contends, "perpetuate the abuser's contention that the victim is responsible for the abuse." Rather, the District Court reached the sound, albeit difficult conclusion, that the

13

best interests of the children required permanency and, given their repeated exposure to domestic violence, the termination of C.C.'s parental rights.

¶38     The District Court's decision is affirmed.


                                        /S/ W. WILLIAM LEAPHART


We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ PATRICIA O. COTTER