No. 02-129

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 125

IN THE MATTER OF K.C.H.,

    A Youth In Need Of Care.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DN-2000-055
Honorable Diane G. Barz, Presiding

COUNSEL OF RECORD:

    For Appellant:

        Matthew L. Erekson, Attorney at Law, Billings, Montana

    For Respondents:

        Honorable Mike McGrath, Attorney General; Jim Wheelis, Assistant
Attorney General, Helena, Montana

        Dennis Paxinos, County Attorney; Jeff R. Lynch, Deputy
County Attorney, Billings, Montana

        Kevin E. Gillen, Attorney at Law, Billings, Montana (For Mother)

        Patrick E. Kenney, Attorney at Law, Billings, Montana (Guardian ad Litem)

Submitted on Briefs:  August 8, 2002

Decided:  April 29, 2003

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Appellant, the natural father of K.C.H., appeals the District Court's Order of January 9, 2002 terminating his parental rights. We affirm.

¶2 Appellant raises several issues on appeal which we have tailored for clarity as follows:

¶3 1. Whether the District Court erred in taking judicial notice of the natural mother's prior termination proceeding?

¶4 2. Whether the District Court erred in adjudicating K.C.H. as a "Youth in Need of Care"?

¶5 3. Whether the District Court erred in terminating Appellant's parental rights?

¶6 4. Whether § 41-3-301, MCA, the emergency protection service statute, is constitutional?

## Background

¶7 In April 2000, the Department of Public Health and Human Services (Department) learned that R.B.-H. was due to deliver a child in June. R.B.-H. had previously been a party to a termination proceeding which culminated in her relinquishing custody of her three children to the Department on September 15, 1998. Approximately one month before K.C.H.'s birth, R.B.-H and Appellant were interviewed by a social worker for the Department. During the interview, Appellant stated that R.B.-H. would be the baby's primary care giver because the Appellant worked nights.

2

¶8 K.C.H. was born on June 9, 2000. At that time, social workers for the Department placed a forty-eight hour hold on the child as permitted by the emergency service protection statute, § 41-3-301, MCA. Two days later, the Department removed the child from the hospital for emergency placement and subsequently the Department filed a Petition for Temporary Custody. Soon thereafter, the District Court appointed counsel for both parents and a guardian ad litem for K.C.H. Over the course of a year, the Department filed two more petitions for Temporary Custody and Appellant signed off on two treatment plans. K.C.H. has been in the custody of the Department since her birth.

¶9 After Appellant established his paternity of K.C.H., the District Court addressed his motion for summary judgment which asserted that the emergency protective service statute, § 41-3-301, MCA, was unconstitutional. The District Court denied Appellant summary judgment and ruled that the emergency service protective statute was constitutional. In June 2001, the District Court adjudicated K.C.H. as a "Youth in Need of Care," pursuant to § 41-3-102, MCA. Finally, in September 2001, the Department filed a Petition for Permanent Legal Custody, Termination of Parental Rights and Right to Consent to Adoption. Appellant then filed a Motion for a Directed Verdict. In response, the District Court entered its Findings of Fact, Conclusions of Law, and Order terminating Appellant's parental rights.

¶10 Following the judgment, the Appellant filed a Notice of Appeal, stating he appealed "from the judgement and order of the Thirteenth District Court, Judge Diane Barz, presiding, Order dated January 9, 2002." We affirm the District Court's Order in its entirety.

Discussion

3

¶11 The decision to terminate parental rights is a discretionary ruling reviewed for an abuse of discretion. *See In the Matter of C.P.*, 2001 MT 187, ¶ 9, 306 Mont. 238, ¶ 9, 32 P.3d 754, ¶ 9; *In the Matter of J.M.J.*, 1999 MT 277, ¶ 16, 296 Mont. 510, ¶ 16, 989 P.2d 840, ¶ 16. The test for an abuse of discretion is "whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *In the Matter of C.P.*, ¶ 9 (citation omitted).

¶12 The standard of review of a district court's findings of fact in a parental termination case is whether the findings in question are clearly erroneous. *See In the Matter of P.E.* (1997), 282 Mont. 52, 56, 934 P.2d 206, 209; *In the Matter of J.L.* (1996), 277 Mont. 284, 287, 922 P.2d 459, 461. The standard of review of a district court's conclusions of law in such cases is whether its conclusions are correct. *See In the Matter of P.E.* (1997), 282 Mont. at 56-57, 934 P.2d at 209; *In the Matter of J.L.*, 277 Mont. at 287, 922 P.2d at 461.

I

¶13 Whether the District Court erred in taking judicial notice of the natural mother's prior termination proceeding?

¶14 Appellant claims that the District Court erred in taking judicial notice of the previous proceeding against R.B.-H., which culminated in her relinquishing custody of her three children in 1998. Appellant contends that the court records in that proceeding were sealed and, therefore, the District Court took notice of facts that were not known and could not be discovered by the Appellant. The Department points outs though, that Appellant was served three petitions. Attached to each petition was a "Report to the Court." Each report contained

over twenty pages detailing the Department's interaction with R.B.-H. from 1991 until she relinquished her parental rights to the three children in 1998. The Reports included information regarding the removal of the three children from R.B.-H. and her relinquishment of parental rights. Appellant, undoubtedly, was aware of the prior termination proceeding. However, nothing in the present record indicates that he attempted to access the court records of the proceeding even though § 41-3-205(2), MCA, permits a court to disclose confidential records of termination of parental rights when disclosure is necessary for the fair resolution of an issue before it.

¶15 Rule 201, M.R.Evid., authorizes a court to take judicial notice of certain facts. "A fact to be judicially noticed must be one not subject to reasonable dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Rule 201(b)(2), M.R.Evid. Rule 202 (b)(6), M.R.Evid., permits a court to take judicial notice of law, including the "[r]ecords of any court of this state . . . ."

¶16 Under Rule 202(b)(6), M.R.Evid., the District Court was correct in taking judicial notice of the proceeding involving R.B.-H. as it is a "record of a court of this state." The fact that Appellant could not access these records without petitioning the Court for their disclosure does not make them entirely inaccessible. Therefore, the District Court did not err in taking judicial notice of the prior termination proceeding.

II

¶17 Did the District Court err in adjudicating K.C.H. as a "Youth in Need of Care"?

5

¶18     Before terminating parental rights, the district court must first adjudicate the child as a "Youth in Need of Care." *See* § 41-3-609(1)(f), MCA.  Under Montana Code, "[a] '[y]outh in need of care' means a youth who has been adjudicated or determined, after a hearing, to be or to have been abused or neglected." Section 41-3-102(23), MCA (1999).  "'Abused or neglected' means the state or condition of a child who has suffered child abuse or neglect." Section 41-3-102(3), MCA (1999).  Child abuse or neglect is defined as either "actual harm to a child's health or welfare" or "substantial risk of harm to a child's health or welfare." Section 41-3-102(7)(a)(i) and (ii), MCA (emphasis added).

¶19     The District Court's order of June 11, 2001, in which it adjudicated K.C.H. a "Youth in Need of Care,"concluded that K.C.H. was "in immediate or apparent danger of harm." Appellant argues that, because K.C.H. was removed from her parents at birth, she was never abused or neglected by them, and thus the District Court erred in adjudicating K.C.H. as a "Youth in Need of Care."  Appellant contends that actual, not prospective, abuse or neglect is required for a child to be deemed a "Youth in Need of Care."  Appellant's argument, however, ignores the plain language of § 41-3-102(7)(a)(ii), MCA.  This statute provides that a "substantial risk of harm to a child's health or welfare" constitutes child abuse.

¶20     Recently, this Court addressed the issue of prospective abuse in *In the Matter of C.P.*, 2001 MT 187, 306 Mont. 238, 32 P.3d 754, where we upheld the termination of a natural mother's parental rights and the adjudication of a ten-day-old newborn as a "Youth in Need of Care."  In that case, the mother's parental rights to C.P.'s sibling had been terminated one month prior to C.P.'s birth.  Although, like K.C.H., C.P. had not been actually abused or

neglected by his mother, testimony from trial indicated that the mother presented a moderately high risk of child abuse. *See C.P.*, ¶ 6. Ultimately, this Court concluded that "[t]he primary basis for the termination of parental rights was the court's reliance on the fact that [the mother's] parental rights to [the sibling], had been involuntarily terminated and the circumstances related to the termination remained relevant to her ability to adequately care for [her newborn]," *C.P.*, ¶ 13. In affirming the termination of the mother's parental rights, we held that "the continuation of the parent-child relationship between [the mother] and [child] will likely result in substantial risk of harm to [the child's] health or welfare." *C.P.*, ¶ 20.

¶21 Appellant's statement that R.B.-H., K.C.H.'s natural mother, would be the child's primary care giver required the District Court to consider R.B.-H.'s circumstances even though she is not party to this appeal. If there was any indication that the Appellant would be the primary care giver, then the mother's circumstances and the fact that she has been party to previous termination proceedings would be less relevant. As it stands, though, Appellant is on record as stating that R.B.-H. would be the child's primary care giver. Thus, the District Court was called upon to determine whether the termination of R.B.-H.'s parental rights to K.C.H.'s three siblings remained relevant to her ability to adequately care for K.C.H. Dr. Tranel, the licensed psychologist who performed psychological evaluations on both parents, concluded that it was very unlikely that R.B.-H.'s "extensive limitations in parenting performance ha[d] changed from the previous years when it had been determined that she could not adequately provide for the needs of her young children." The District

7

Court, in its findings, similarly found that R.B.-H. "displayed the identical symptoms of a personality disorder in this case as she did in [the termination proceedings of K.C.H.'s three siblings]: a pattern of detachment, lack of nurturing and warmth . . . just like her pattern with the other three children."

¶22 Therefore, because the circumstances related to the termination of R.B.-H.'s parental rights to K.C.H.'s three siblings have not changed, and because she would be K.C.H.'s primary care giver, there was a substantial risk of harm posed to the health and welfare of K.C.H. The District Court did not err in finding that K.C.H. was "in immediate or apparent harm." Accordingly, we affirm the District Court's adjudication of K.C.H. as a "Youth in Need of Care."

### III

¶23 Whether the District Court erred in terminating Appellant's parental rights?

¶24 Pursuant to § 41-3-609(f), MCA, once a child is adjudicated as a "Youth in Need of Care," parental rights may be terminated if both of the following exist: (1) an appropriate treatment plan that has been approved by the court has not been complied with by the parent or has not been successful; and (2) the conduct or condition of the parent rendering them unfit is unlikely to change within a reasonable time. *See* § 41-3-443, MCA. Appellant argues that neither of his treatment plans were appropriate and, therefore, the District Court erred in terminating his parental rights to K.C.H.

¶25 Appellant maintains that his treatment plans were not "appropriate" because they did not satisfy the requirements of § 41-3-443, MCA. This section provides that every treatment

8

plan must identify the "problems or conditions that resulted in the abuse or neglect of [the] child." Section 41-3-443(2), MCA. Again, Appellant hangs his hat on the fact that K.C.H. was never actually abused and, consequently, his treatment plans necessarily failed to address the "problems or conditions that resulted in the abuse or neglect of" K.C.H. While the Appellant is correct that his treatment plans did not identify the "problems or conditions that *resulted* in the abuse" because, as noted above, no actual abuse occurred, both of his plans did identify the problems or conditions creating the substantial risk of harm to the health and welfare of K.C.H., that is, the lack of a stable home and safe environment. Because of the natural mother's demonstrated inability to care for her children, Appellant's treatment plans put the onus on *him* to provide a safe environment for K.C.H. Both of Appellant's treatment plans listed one of his primary goals as to "provide a stable home [for] his child with adequate housing and income." Therefore, because Appellant's treatment plans did identify the threshold "problems or conditions" creating the substantial risk of harm to the health and welfare of K.C.H., specifically that he, as opposed to R.B.-H., provide K.C.H. a stable home with adequate housing and income, the plans were appropriate under § 41-3-443, MCA.

¶26 Appellant also contends that the District Court erred in concluding that he failed to comply with his treatment plans; however, Appellant offers no evidence of his substantial compliance with either plan. Again, the record is replete with evidence of his inability to secure either a residence or a job, key requirements of both treatment plans. On several occasions, social workers could not locate the Appellant at his listed address. Similarly,

9

Appellant did not provide the Department with any evidence of gainful employment, such as pay stubs. The District Court did not abuse its discretion in determining that both elements of § 41-3-609(f), MCA, were present and accordingly terminating Appellant's parental rights.

IV

¶27 Whether § 41-3-301, MCA, the emergency protection service statute, is constitutional?

¶28 Appellant claims that § 41-3-301, MCA (1999), which allows the immediate removal of the child from the family in emergency situations, is unconstitutional. The constitutionality of this statute, however, is not an issue properly brought for appeal as this issue was not addressed in the District Court's final judgment, dated January 9, 2002, from which the Appellant appeals. Instead, the District Court ruled on the constitutionality of the statute in its denial of Appellant's "Motion for Summary Judgment," dated April 12, 2001.

¶29 Rule 4(c), M.R.App.P., requires that the notice of appeal designate the "judgment, order or part thereof appealed from." In *State v. Spotted Blanket*, 1998 MT 59, ¶ 12, 288 Mont. 126, ¶ 12, 955 P.2d 1347, ¶ 12, this Court held that it "will not consider an appeal from an order not designated in the notice of appeal." Therefore, this Court will not consider any judgment other than the one listed in Appellant's notice of appeal. Appellant's notice of appeal confined this appeal to "the judgement and order of the Thirteenth District Court, Judge Diane Barz, presiding, Order dated January 9, 2002." Consequently, the Appellant has not preserved his right to appeal any ruling other than this judgment. Because

Appellant did not preserve an appeal of the April 12, 2000, Order, and the issues contained therein, the constitutionality of the emergency protection service statute will not be addressed by this Court.

¶30    Therefore, we uphold the District Court's adjudication of K.C.H. as a "Youth in Need of Care" and hold that it did not err in terminating Appellant's parental rights.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JIM REGNIER
/S/ JIM RICE

Justice Terry N. Trieweiler dissenting.

¶31    I dissent from the majority Opinion.

¶32    The Appellant father had his daughter snatched from him at the hospital following her birth without a prior court order and without any evidence of prior conduct by him which would have endangered the child, but based simply on prior conduct of the child's mother toward other children. He was prescribed a treatment program which could not have been related to the reasons for which his daughter was taken because his daughter's abduction had nothing to do with him or his parenting abilities. There was obviously nothing he could have done to recover his child by completing the treatment program when he has never had a prior opportunity to prove his suitability as a parent and his suitability as a parent was never relevant in the first place. This case is simply another example of government bureaucracy run amok and the court turning a blind eye based on some social worker's perception of a child's best interests.

¶33    I dissent from the majority's refusal to consider the constitutionality of § 41-3-301, MCA, as applied to the Appellant, and would conclude that as applied to him, it is unconstitutional. The majority avoids that critical issue by elevating form over substance to conclude that the District Court's decision regarding the statute's constitutionality was not part of its final judgment. The majority relies on Rule 4(c), M.R.App.P. However, the majority ignores Rule 2, M.R.App.P., which provides that this Court has jurisdiction to consider the "verdict or decision, and any intermediate order [objected to] . . . which involves the merits, or necessarily affects the judgment. . . ." The Appellant did challenge

12

the constitutionality of § 41-3-301, MCA, when he moved for summary judgment. That motion was denied and its denial affected the judgment because it related to the legality of the State's initial intervention in these people's lives.

¶34 The majority's construction of Rule 4(c), M.R.App.P., is akin to stating that a simple notice of appeal from a judgment is insufficient to authorize review of evidentiary rulings made during trial. That has never been a rule on appeal and if it was, would fly in the face of "the philosophy of modern appellate practice that technical defects of procedure should not bar a party from access to the courts." *Wilhelm v. Owens Enterprises, Inc.* (1990), 242 Mont. 285, 288, 790 P.2d 467, 469 (citing *Tefft v. Tefft* (Mont. 1981), 628 P.2d 1094, 1097, 38 St.Rep. 837, 840). If the majority was to review the Appellant's constitutional challenge, it would have to conclude that as applied in this case, § 41-3-301, MCA, was unconstitutional. However, in doing so, it would avoid future unconstitutional application of the statute and breathe life into the liberty interest that parents have in their right to the custody of their children. *See Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551. Because of that fundamental right, children cannot be taken from their parents, without due process of law, except in the event of an emergency. *See Santosky v. Kramer* (1982), 455 U.S. 745, 753-54, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599. Here there was no emergency. The Department of Public Health and Human Services received notice that the mother of K. C. H. was going to deliver a baby on April 4, 2000, over two months prior to that delivery. A social worker from the Department interviewed both parents on May 10, 2000, and learned everything which later formed the basis for the Department's petition. K.

13

C. H. was not born until June 9, 2000. No petition was filed with the court until four days later–two days after she was taken from her parents–and no hearing was held for nearly three weeks until June 29, 2000.

¶35 Section 41-3-301, MCA, was unconstitutional as applied to the Appellant under these circumstances because he was denied the fundamental interest in the custody of his daughter without a minimal effort to provide him due process and no emergency existed because the facts which formed the basis for depriving him of his daughter were well known to the State a month or more prior to the time she was actually snatched from him. This was a blatant violation of his constitutional rights and this Court should say so. The consequence of its refusal to do so is to encourage the State to act similarly in the future. That is a bad result for a court entrusted with enforcing the constitutional rights of individuals, and a bad example at a time when this country sees as its responsibility to bring freedom and justice to the rest of the world.

¶36 In addition to the fact that K. C. H. was initially unlawfully taken from her father, there was no legally consistent basis for terminating his rights. The majority concedes that parental rights cannot be terminated in this case unless the child was adjudicated a "youth in need of care" and that that requires a finding that the child has been abused or neglected. The majority then concludes that abuse or neglect need not have actually occurred if there was a prospect that the child would be abused or neglected. With that much, I agree. However, the District Court and this Court then decide that the father's parental rights could be terminated even though he had never abused nor neglected his daughter because there was

14

a prospect that the child's mother would abuse or neglect her. Even if that was a sufficient basis for terminating the father's parental rights, they couldn't be terminated pursuant to § 41-3-609(1)(f), MCA, without an appropriate treatment plan which has been unsuccessful. Here, the father's treatment plan related to his own housing situation, employment status, and mental health, when none of those factors were reasons for finding that the child was abused and neglected. In fact, at least one of them was completely inconsistent with the ostensible reason for concluding that the father was vicariously responsible for potential abuse or neglect. To establish abuse and neglect, the State argued, and this Court agrees, that the mother would be the primary caregiver because the father works nights. Yet, to establish that the father had not satisfactorily completed his treatment program, the State argues that the father has been unable to establish employment.

¶37 What it boils down to in this case is that a father had his parental rights terminated because the mother of his child had previously mistreated other children and he does not live a lifestyle which is acceptable to the assigned social worker and this Court. It is mind boggling to think that a person can have something as precious as parental rights terminated on the basis of another's conduct and his economic status in spite of the fact that he has never had an opportunity to care for the child. When asked, the State's social worker testified as follows:

Q. Okay, has my client ever physically abused K.?

A. No.

Q. Has my client ever sexually abused K.?

15

A. No.

Q. Would you consider or describe my client's action as trying to abandon K.?

A. No.

Q. Has he neglected her?

A. He had never had–he has never cared for her.

Q. So, again, that is a no, H.A. hasn't neglected her?

A. No.

¶38 Section 41-3-443, MCA, requires that treatment plans identify the problems or conditions that resulted in abuse or neglect. Presumably, therefore, the treatment plan must be addressed to those problems or conditions. How could the father's treatment plan address problems that the mother had or the condition of the mother's health? Specifically, how could the father spend more time caring for the child when one of the conditions of the treatment plan was that he obtain regular employment? The answer is obvious. The father's parental rights were terminated because of the mother's prior history of abuse and neglect. There is nothing that he could possibly have accomplished by way of a treatment plan which would ever have changed that fact and his rights as a parent were doomed regardless of how successfully he participated and completed the treatment plan.

¶39 Finally, the father was denied due process for a second time when the District Court, on the day of his hearing, took judicial notice of prior proceedings involving the mother. He did not participate in those proceedings. He had no reason to investigate those proceedings prior to the date of his hearing. And, assuming he had investigated those proceedings, there

is no indication that all the evidence given to the District Court was part of any record that he could have reviewed.

¶40    The majority's solution to the fact that the State's case was proven in part by evidence to which the father had no opportunity to respond is to suggest that the problem was solved by a "report to the court" attached to the State's petition which detailed prior contacts with the child's mother.  However, there is no indication that the information in the reports represents all of the information of which the District Court took judicial notice or is even representative.  It should be assumed that the mother was represented in the prior proceeding and that arguments were made or evidence presented on her behalf.  However, that certainly would not be concluded in the Department's report to the Court.

¶41    The majority criticizes the father for making no prior effort to access the prior proceedings pursuant to § 41-3-205(2), MCA.  However, there is no indication in the record that he had any reason to access that information.  The State did not ask the court to take judicial notice of the information in the prior case until the day of the hearing.

¶42    The Court relies on Rule 201(b)(6), M.R.Evid., as authority for the District Court to take judicial notice of law, including the "[r]ecords of any court of the state."  However, there is no indication in this record that the court's judicial notice was limited to records. The County attorney asked the court to take judicial notice of "previous proceedings" in which the mother's rights to three other children were terminated.  He was not even able to refer the court to the previous cause number.  The court simply ruled that it would "take judicial notice of all prior proceedings that this court handled personally in this matter."  It

17

defies imagination how the father was supposed to respond to that kind of amorphous "evidence" without even having prior notice that it would be offered.

¶43     This process was tainted from beginning to end.  This father had his daughter taken from him without prior notice or an opportunity to be heard before he ever had a chance to care for her based on another person's conduct which had occurred years earlier and was unrelated to the care or treatment of this child.  He was then compelled to participate in a treatment program which was doomed to failure because, no matter how successful, it could not affect the primary reason for which his daughter was taken from him.  Then the State was allowed to prove its case in part by reference to evidence presented in another case in which he had not participated, about which he had no prior information, and which he was in no position to disprove.  The fact that the majority would condone this process is simply the most recent example of the judiciary's blind eye toward the whole termination process, and its abuses.  Although I have no doubt that the majority of this Court and everyone involved are motivated by good intentions and of legitimate concern for the best interests of this child, our laws and procedures are designed to assure that children are not taken from parents based simply on their economic status or their lifestyle.  After considering the arguments of the State and the Court's rationale for affirming the District Court, I conclude that the precautions built into our system have not worked as intended in this case.  Therefore, I dissent from the majority Opinion.


/S/ TERRY N. TRIEWEILER