

DA 08-0103

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2008 MT 272

IN THE MATTER OF
D.B. and D.B.,

Youths in Need of Care.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DN-2004-055
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Jim Wheelis, Chief Appellate Defender, Roberta R. Zenker, Assistant
Appellate Defender, Helena, Montana

For Appellee:

Hon. Mike McGrath, Montana Attorney General, C. Mark Fowler,
Assistant Attorney General, Helena, Montana

Fred R. Van Valkenburg, Missoula County Attorney, Diane Conner,
Deputy County Attorney, Missoula, Montana

Submitted on Briefs: June 25, 2008

Decided: August 5, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    C.B., mother of D.B. and D.B., appeals the Fourth Judicial District Court's order terminating her parental rights and the court's denial of her motion to dismiss. We affirm.

## ISSUES

¶2    A restatement of the issues is:

¶3    Did the District Court err in denying C.B.'s motion to dismiss?

¶4    Are the District Court's findings of fact contained in the order of termination clearly erroneous?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5    This is the second time C.B. has been before us on appeal. In our earlier decision, *In re D.B.*, 2007 MT 246, 339 Mont. 240, 168 P.3d 691 (hereinafter *D.B. I*), we set forth the background of this parental termination proceeding. We will therefore summarize the previous facts and provide additional facts as required for our analysis.

¶6    In October 2004, the Department of Public Health and Human Services, Child and Family Services (CFS or Department) petitioned for emergency protective services and temporary investigative authority of C.B. and her infant children in accordance with §§ 41-3-422 and -427, MCA. The Department had reason to believe the children were in danger of abuse or neglect due to C.B.'s drug use and her relationship with an abusive boyfriend. The children were removed from the home and placed in foster care. C.B. did not object to the petition and in December 2004 the court granted it. In May 2005, C.B.

2

stipulated that she had neglected the infants and the court entered an order adjudicating the children as youths in need of care.

¶7 In June 2005, C.B. was incarcerated on a parole violation. Shortly thereafter, CFS presented a treatment plan for C.B. that contained twenty-one goals designed to address C.B.'s chemical dependence and history of domestic violence. Initially C.B. objected to the plan because it required her to undergo a neuropsychological evaluation. She subsequently withdrew her objection. The District Court approved the plan in December 2005.

¶8 C.B. reported that, as required by her treatment plan, she attended AA/NA meetings while incarcerated. It is unclear whether she provided attendance records to corroborate this. CFS arranged for individual therapy sessions that C.B. could attend while she was incarcerated. C.B. did not like the therapist and unilaterally discontinued therapy while incarcerated. Upon C.B.'s release from prison in early January 2006, counselors began working with her immediately on the treatment plan goals. C.B.'s compliance with many goals, however, was sporadic and inconsistent.

¶9 A neuropsychological evaluation conducted in March 2006 revealed that C.B. had mild to moderate cerebral dysfunction, post-traumatic stress disorder based on domestic abuse, and paranoid and schizoid personality traits. The report indicated that C.B. has difficulty learning new information especially if presented orally. The evaluator testified that C.B.'s cognitive impairment would not improve over time but that she could employ some compensatory techniques to help her. Such techniques include visual checklists, reminders from other people, repetition, and assistance from third parties in

understanding new circumstances and making decisions. The written treatment plan was not revised to reflect these cognitive and emotional disabilities.

¶10     In July 2006, CFS filed a petition to terminate C.B.'s parental rights. Four months later the District Court conducted a hearing on the petition. C.B. objected to what she described as "onerous" conditions in her treatment plan and complained that CFS did not provide her with adequate support. On December 28, 2006, the District Court issued an order terminating her rights. C.B. appealed this decision. In September 2007, we reversed and remanded the matter to the District Court. We concluded that the District Court had erred by applying the wrong statutory standards to assess whether C.B.'s rights should be terminated and by failing to provide specific factual findings as required by § 41-3-609(1)(f), MCA. We set forth the proper statutory criteria and instructed the District Court to apply the criteria on remand.

¶11     On receipt of the remanded case, the District Court concluded that it could comply with our instruction by relying on the record created in the underlying proceeding. C.B. objected and, on October 29, 2007, moved to dismiss on the grounds that the court's approach would violate her "due process right to an appropriate treatment plan." In November, CFS filed a renewed petition to terminate C.B.'s parental rights. On December 3, 2007, the District Court denied C.B.'s Motion to Dismiss and, on January 25, 2008, it entered new Findings of Facts, Conclusions of Law and Order, again terminating C.B.'s parental rights. C.B. filed a timely appeal of both orders.

## STANDARDS OF REVIEW

¶12    The question of whether a district court properly denied a motion to dismiss is a conclusion of law which we review to determine if the court's interpretation and application of the law is correct. *Dime Ins. Agency v. Johnson*, 279 Mont. 121, 123, 926 P.2d 733, 734 (1996) (citation omitted).

¶13    We review a district court's findings of fact in a parental termination case to determine whether the findings in question are clearly erroneous.   The court's conclusions of law in such cases are reviewed for correctness and its decision to terminate parental rights is a discretionary ruling reviewed for an abuse of discretion. *In re K.C.H.*, 2003 MT 125, ¶¶ 11-12, 316 Mont. 13, ¶¶ 11-12, 68 P.3d 788, ¶¶ 11-12 (citations omitted).

## DISCUSSION

¶14    As noted above, in *D.B. I*—the first appeal in this matter—we reversed and remanded the matter to the District Court holding that the court had failed to make the specific factual findings required by § 41-3-609(1)(f), MCA; namely, whether C.B.'s treatment plan was appropriate, whether she completed the treatment plan, and whether her condition was unlikely to change within a reasonable time. *D.B. I*, ¶ 25. We noted that the District Court prematurely applied the presumption found in § 41-3-604(3), MCA, which states that there is a legal presumption that termination of parental rights is appropriate in cases where children have been in foster care for 15 of the last 22 months. *D.B. I*, ¶ 40.   We explained that this presumption "neither eliminates the substantive requirements of § 41-3-609, MCA, nor diminishes the clear and convincing burden of

proof on the party seeking termination of parental rights." *D.B. I*, ¶ 23. Only after the court has made the factual findings required by § 41-3-609(1)(f), MCA, may the court properly "take the statutory presumption favoring termination into consideration." *D.B. I*, ¶ 40. We provided factors to be considered by the District Court on remand in determining the appropriateness of the treatment plan's conditions, including the parent's special needs and deadlines for achieving the identified goals. *D.B. I*, ¶¶ 32-36. We also reiterated the statutory factors to be considered in determining whether a parent's conduct or condition is unlikely to change within a reasonable time. *D.B. I*, ¶¶ 31-39.

¶15    *Did the District Court err in denying C.B.'s motion to dismiss?*

¶16    Upon receipt of the case on remand, the District Court announced it would rely on the existing record to issue revised factual findings and conclusions. C.B. protested and moved to dismiss the case claiming that the record created during the District Court proceeding did not contain sufficient evidence to allow the District Court to apply the proper statutory criteria required by *D.B. I*. The District Court denied her motion, noting that dismissal was an extreme sanction that was inappropriate in this case. The court expressly interpreted *D.B. I* as a "directive for further proceedings on the original petition." The court surmised that had dismissal been warranted and required, we would have dismissed the case on appeal. The court further stated that § 41-3-442(5), MCA, authorizes a district court to continue orders for temporary legal custody (TLC) pending hearings on a petition for termination. The court noted that TLC had been extended on multiple occasions without C.B.'s objection.

¶17 On appeal, C.B. insists that the District Court erred by denying her motion to dismiss because it is impossible for CFS to prove a set of facts from the existing record that would support the findings required by § 41-3-609(1)(f), MCA.

¶18 CFS counters that C.B.'s dismissal arguments presented on appeal are based on a misreading of *D.B. I*. The Department submits that *D.B. I* did not conclude that C.B.'s treatment plan was inappropriate, nor did it void the treatment plan or mandate a new plan. CFS further posits that our ruling in *D.B. I* did not assure additional remedies such as a new hearing or new findings to C.B., nor did it conclude that C.B.'s plan did not address her cognitive impairments. Additionally, the Department argues that our reversal of the District Court's original order of termination left the children's prior legal status intact. In other words, the children remained youths in need of care and CFS retained temporary legal custody over them. C.B. did not contest either of these elements of the underlying case. CFS further asserts that the legislature clearly established the criteria for dismissal of an abuse and neglect petition in § 41-3-424(1), MCA, and that C.B. did not allege, and cannot prove, satisfaction of the criteria.

¶19 As indicated above, CFS initiated this action against C.B. by filing a petition under § 41-3-422, MCA, alleging abuse and neglect of C.B.'s children. Once a child has been adjudicated a youth in need of care, the Department and the court are bound to proceed in a manner designed to protect the child. Section 41-3-424, MCA, provides the circumstances under which an abuse/neglect petition can be dismissed:

> Unless the petition has been previously dismissed, the court shall dismiss an abuse and neglect petition on the motion of a party, or on its own motion, in any case in which all of the following criteria are met:

7

(1) a child who has been placed in foster care is reunited with the child's parents and returned home;

(2) the child remains in the home for a minimum of 6 months with no additional confirmed reports of child abuse or neglect; and

(3) the department determines and informs the court that the issues that led to department intervention have been resolved and that no reason exists for further department intervention or monitoring.

¶20 It is undisputed that C.B. cannot satisfy the criteria established in § 41-3-424, MCA. Furthermore, C.B. appears to overstate our ruling in *D.B. I*. As pointed out by CFS, we did not hold in *D.B. I* that C.B.'s treatment plan was inappropriate or that she was entitled to a new plan or further hearings. We did not hold that her due process rights were violated or that her parental rights were wrongfully terminated. Nor did we determine that the record of the underlying proceeding failed to contain sufficient evidence to support the findings we instructed the District Court to provide. We simply instructed the District Court to comply with the statutory requirements. Dismissal of the Department's abuse and neglect proceeding against C.B. is inappropriate and unavailable under § 41-3-424, MCA. The children remain youths in need of care and the District Court must resolve the matter by providing some form of relief as established in § 41-3-422(1), MCA. Under these circumstances, the District Court did not err in denying C.B.'s motion to dismiss.

¶21 *Are the District Court's findings of fact contained in the order of termination clearly erroneous?*

¶22 In January 2008, the District Court issued a detailed twenty-eight page Findings of Fact, Conclusions of Law and Order that incorporated its original twelve-page Opinion and Order issued in 2006 terminating C.B.'s parental rights. In its 2008 order, the court

8

individually addressed each condition of C.B.'s treatment plan. It expressly stated that each condition was appropriate and explained its ground for so determining. It also explained, for each condition, why and how the condition addressed C.B.'s special cognitive needs and/or her substance abuse and domestic violence issues.

¶23 Addressing this Court's concern over the lack of deadlines in the treatment plan, the District Court explained the original and subsequent "timelines" imposed on C.B. to accomplish the tasks identified in her treatment plan. While the court acknowledged that specific dates for achieving specific goals were not included in the treatment plan, this did not mean that no timelines were imposed. Given the nature of the tasks in the treatment plan (e.g., participate in weekly support sessions, abstain from use of alcohol and drugs, follow and complete the recommendations of treatment counselors, participate in AA/NA, write weekly letters to her children, etc.), the court did not prioritize the tasks; rather it intended that they all be pursued simultaneously. Therefore, the court viewed the expiration dates for the treatment plan as deadlines for completing the tasks. As indicated above, in December 2005, the District Court approved Phase I of the treatment plan which was to remain in effect until March 30, 2006, or until further order of the court. Therefore, the court considered March 30, 2006, as a deadline for achieving the goals in the treatment plan.

¶24 The District Court further explained in its 2008 order that upon C.B.'s release from prison in January 2006, CFS established an "intensive" program for C.B. and began actively making referrals to help her accomplish the goals and tasks of her treatment plan in early 2006. Subsequent to C.B.'s March 2006 neuropsychological evaluation, the

9

treatment plan was extended until August 2006. While the written terms of the treatment plan were not revised, the District Court revealed in its order that therapists working with C.B. under her treatment plan approached their tasks and interactions with C.B. specifically in recognition of the results of her cognitive evaluation.

¶25   For example, CFS worked patiently with C.B. in its attempts to find a suitable therapist and therapy program for C.B. upon C.B.'s release from jail. Under the treatment plan, C.B. was responsible for contacting the YWCA in January 2006 regarding support group services and to attend the sessions recommended by the YWCA staff. When, at the time of her neuropsychological evaluation in March 2006 she had not yet contacted the YWCA, CFS suggested private counseling would be more suitable based upon C.B.'s evaluation. Given C.B.'s past unhappiness with various therapists, the Department asked C.B. to identify a therapist with whom she would like to work. Several weeks later, C.B. provided the name of a heath care professional with inadequate credentials and without the appropriate specialty background. Thereafter, CFS arranged for C.B. to work individually with a clinical social worker and therapist, Katherine Florez, on a weekly basis beginning in mid-April 2006.

¶26   Florez, in consideration of C.B.'s cognitive evaluation report and with C.B.'s assistance, devised a written checklist with simplified task descriptions. The checklist prioritized the tasks and included such treatment plan items as attending AA/NA meetings and calling a daily urinalysis (UA) hotline to learn whether she needed to submit to testing. Through repetition and reminders, Florez attempted to assist C.B. in accomplishing the listed tasks. Additionally, the evaluation recommended that C.B.

undergo domestic violence education. Florez specifically incorporated such education into C.B.'s therapy. Because C.B.'s neuropsychological evaluation advised that C.B. would benefit from taking anti-depressant medication, Florez arranged to get the appropriate prescription for C.B.

¶27 Florez had multiple hour-long telephone conferences with C.B.'s CFS social worker to identify methods that each could utilize to address C.B.'s special needs and help her be successful. Unfortunately, C.B. displayed opposition and defensiveness. Between mid-April 2006 and late July, C.B. missed five of fifteen scheduled appointments and quit therapy at the end of July because she interpreted the counselor's "constructive suggestions" as additional demands. As long-term therapy was recommended by C.B.'s evaluation and other therapists, the CFS social worker tried to convince C.B. to return to therapy with Florez. When these attempts failed the Department compiled a list of other therapists, with phone numbers, and offered to contact them to arrange for further counseling. C.B. indicated that she would call and make an appointment. It took C.B. until October 2006 to choose another therapist, and then she attended only one session. C.B.'s CFS case worker, in deference to C.B.'s "lack of trust issues" identified in her evaluation, refrained from contacting this therapist in order to deflect C.B.'s fears that her new therapist was reporting to CFS.

¶28 CFS displayed repeated flexibility when C.B. "forgot" to call in for UA testing or failed to show up for testing due to her work schedule. The Department offered to go to her for a test rather than have her come to them or, alternatively, they offered to test a hair sample. C.B. declined these offers. Despite the Department's efforts through

11

reminders, repetition and flexibility to help C.B. remain sober, she missed forty-nine out of seventy-eight scheduled UAs. Additionally, the Department provided Dialectical Behavior Therapy (DBT) upon C.B.'s release from incarceration. This service was provided even before the neuropsychological evaluation indicated that C.B. possibly could benefit from DBT. C.B., however, missed multiple appointments and the therapist determined this form of treatment would not be effective for C.B. at that time.

¶29 C.B. participated in eight weekly sessions with Family Concepts, the group that supervised visits between C.B. and her children. These sessions were designed to provide parenting feedback instruction and ongoing support. C.B.'s neuropsychological evaluation acknowledged that C.B.'s parenting skills could be adversely affected by her difficulty in interpreting socioemotional cues such as body language and factional expressions. The parenting feedback instruction through Family Concepts was designed to help C.B. in this area. While not relevant to C.B.'s cognitive difficulties, CFS offered C.B. transportation vouchers to help defer the cost of traveling to meetings and testing and provided them to C.B. when she requested. Thus, we conclude that the program established by CFS for C.B. did appropriately take into consideration C.B.'s cognitive impairments.

¶30 Lastly, the District Court analyzed each of the twenty-one assigned tasks to determine whether C.B.'s condition or conduct was unlikely to change within a reasonable time. The court expressly acknowledged the eight tasks that C.B. had accomplished including, but not limited to, that she appeared to have severed contact with her former abusive boyfriend, that she was not currently in an abusive relationship,

and that she was not allowing anyone to live in her home without first obtaining CFS approval. The District Court also characterized the likelihood of change for three other tasks as "uncertain," "unclear," or "unknown." These tasks involved participation in AA/NA meetings, participation in parenting-related classes or study, and the maintenance of an alcohol and drug-free home. The court set forth the evidence that led to its "uncertain" status which included conflicting evidence pertaining to task completion and C.B.'s admission of illegal drug use within two weeks of the hearing.

¶31 Additionally, the court explained why, with five of C.B.'s other tasks, it was unable to definitively find whether her conduct was unlikely to change or not. One such task was the requirement that C.B. participate in a neuropsychological evaluation and follow all the recommendations of the evaluation. The court noted that C.B. underwent the evaluation but was not following all of the recommendations. Another task was to refrain from being involved in criminal activity. The District Court found that while she was generally law-abiding, she admitted to using illegal drugs two weeks before the hearing and testified that she was not sure that she would be able to refrain from using drugs again. The court's assessment involved weighing C.B.'s partial compliance with these tasks as well as her counselors' evaluations of her willingness to comply further.

¶32 Finally, as to the five remaining tasks, the District Court found that her conduct or condition was unlikely to change. As it had with the other tasks, it provided its rationale for its findings.

¶33 C.B. asserts that the District Court's 2008 "findings of fact are clearly erroneous in that they do not comport with the requirements of [D.B. I]." She maintains that the

13

record does not support the court's finding that her treatment plan was appropriate. She reasons that because her treatment plan was in place at the time her cognitive difficulties were diagnosed, and her treatment plan was not subsequently modified in writing to acknowledge her "particular problems," the plan was inappropriate. C.B. further challenges the District Court's "global deadline" assigned to the treatment plan, as opposed to task-specific deadlines.

¶34 Additionally, C.B. maintains that the District Court failed to comply with the directives in *D.B. I* pertaining to whether the conduct or condition rendering her unable to parent her children was unlikely to change within a reasonable time. C.B. argues that the court's findings relative to each treatment plan task did not comply with § 41-3-609(2), MCA, in that the court failed to expressly address whether "continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents render the parents unfit, unable, or unwilling to give the child adequate parental care." She points out that CFS moved the court to amend its January 2008 findings to include such statutorily-required findings but the District Court failed to do so.

¶35 CFS counters that the District Court "scrutinized the plan for 'appropriateness' under all the factors outlined in D.B.I." It submits that the District Court outlined the manner in which implementation of the treatment plan was modified to address C.B.'s cognitive needs and provide additional assistance in recognition of those needs. CFS maintains that the record provides "clear and convincing evidence" to support the court's findings of appropriateness.

14

¶36    The Department acknowledges that the District Court failed to expressly enter a finding that C.B.'s conduct or conditions render her unfit, unable, or unwilling to provide her children with parental care.  CFS opines, however, this is not a "fatal" error as alleged by C.B.  It asserts that C.B. is precluded from arguing this error on appeal as she acquiesced to it when she failed to file a timely response to CFS's motion to amend the District Court's order to include such findings.  Alternatively, CFS maintains that the failure to include such task-specific findings is harmless error given that the court made an express conclusion that the conduct and conditions that render C.B. unfit to parent her children are unlikely to change within a reasonable time, and will likely result in continued abuse or neglect because such conduct and conditions render her unfit, unable, or unwilling to give the child adequate parental care.

¶37    There is sufficient evidence in the record to support the District Court's findings pertaining to the appropriateness of C.B.'s treatment plan.  While C.B.'s treatment plan was not amended in writing after a neuropsychological evaluation revealed her cognitive difficulties, there was ample testimony that the counselors assisting C.B. were aware of her diagnoses and modified their methods of assistance in recognition of her difficulties.  As we said in *In re A.N.*, 2000 MT 35, ¶ 26, 298 Mont. 237, ¶ 26, 995 P.2d 427, ¶ 26, there is no "bright line definition" of appropriateness but one factor in determining appropriateness is whether the plan "takes into consideration the particular problems facing both the parent and the child."  *A.N.*, ¶ 27.  The evidence indicates that C.B.'s treatment plan was "customized" to meet her particular needs.  *See In re J.B.K.*, 2004 MT 202, ¶ 28, 322 Mont. 286, ¶ 28, 95 P.3d 699, ¶ 28.  While written modification after

15

C.B.'s evaluation would have precluded this particular challenge, we nonetheless conclude that the District Court did not err in finding C.B.'s treatment plan was implemented in a manner recognizing her particular needs and, therefore, was appropriate.

¶38   Additionally, the tasks established in C.B.'s treatment plan were tasks that reasonably could be undertaken immediately and pursued on an ongoing and simultaneous basis.  While, as we explained in *D.B. I*, ¶ 37, "due process requires the inclusion of a timeline for completion of goals and tasks in a treatment plan," we also have acknowledged that each treatment plan is different.  *D.B. I*, ¶ 36.  In the case before us, the tasks identified in the treatment plan were specific to C.B.'s situation and were implemented in a manner cognizant of her particular needs.  Under these circumstances, the court's imposition of the same deadline for each task is supported by the record and is not clearly erroneous.  Moreover, it does not appear from the record that imposition of specific task-related dates would have had a significant impact on the outcome of C.B.'s performance.  She performed those tasks she was willing to perform and failed to perform those she was unwilling to do.  As we noted in *In re C.B.*, 2001 MT 42, ¶ 16, 304 Mont. 252, ¶ 16, 20 P.3d 117, ¶ 16, "It is well established that 'no civil case shall be reversed by reason of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless.' "

¶39   Similarly, the District Court provided individual explanations for its findings that C.B.'s conduct and condition relative to certain tasks was unlikely to change in a reasonable time.  As a result of these specific findings, which are supported by the record,

the court's conclusion that C.B. will continue being unfit, unable, or unwilling to provide her children with adequate parental care is not incorrect.

## CONCLUSION

¶40   For the foregoing reasons, we affirm the District Court's denial of C.B.'s motion to dismiss and its January 2008 order terminating C.B.'s parental rights.

/S/ PATRICIA COTTER

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE