FILED

January 13 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0399

DA 14-0399

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2015 MT 13N

IN THE MATTER OF:

K.B.,

A Youth in Need of Care.

| APPEAL FROM: | District Court of the Thirteenth Judicial District, In and For the County of Yellowstone, Cause No. DN 11-89 Honorable G. Todd Baugh, Presiding Judge |
|---|---|

COUNSEL OF RECORD:

    For Appellants:

        Carolynn M. Fagan, Fagan Law Office, P.C., Missoula, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General; Katie F. Schulz, Assistant Attorney General, Helena, Montana

        Scott D. Twito, Yellowstone County Attorney; Richard S. Helm, Deputy County Attorney, Billings, Montana

Submitted on Briefs: December 24, 2014
Decided: January 13, 2015

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(d), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 S.B. (Mother) appeals an order of the Thirteenth Judicial District Court terminating her parental rights and granting the Montana Department of Public Health and Human Services (Department) permanent legal custody of her son, K.B. Mother argues that her parental rights should not have been terminated because the Department failed to make reasonable efforts at reunification by denying visitation between Mother and K.B. We affirm.

¶3 The Department sought temporary legal custody of K.B. in July 2011, following a series of reports to and interventions by the Department arising from the parents' substance abuse and domestic violence incidents. K.B., who was born in 2006, was adjudicated as a youth in need of care in September 2011 by stipulation of the parents. Treatment plans were approved for both parents on December 22, 2011, with no objection. Following several extensions of temporary legal custody, K.B.'s father relinquished his parental rights in April 2013. The Department petitioned in June 2013 for termination of Mother's parental rights. Hearing on the Department's petition began in September 2013, and was continued to January 27, 2014. On May 29, 2014, the

2

District Court entered findings of fact and conclusions of law, and an order terminating Mother's parental rights.

¶4 K.B. was placed with a paternal uncle and aunt upon his removal from the family home and remained in that placement at the time of the termination hearing. Dan Cerise, L.C.P.C., began therapy with K.B. on June 22, 2011, in weekly and bi-weekly individual and family therapy sessions. Cerise began to supervise visits between Mother and K.B. in October 2011 at the Department's request, after Department staff observed Mother making inappropriate statements during visits with K.B., such as telling him that his aunt and uncle were lying to him and talking to him about coming home soon. Although Cerise counseled Mother on the ground rules for appropriate behavior during visits, Mother was emotional and crying during visits with K.B. and openly attempting to question Cerise in front of her son about why K.B. could not be returned to her custody.

¶5 Several visits had to be cancelled because of Mother's arrest and incarceration. After Mother was arrested again on November 30, Cerise advised the Department that the visits needed to stop because of the impact on K.B. Cerise told the court during an April 2013 hearing that Mother's behaviors and the disruptions from her arrests had serious negative impacts on K.B., including unprovoked incidents of violence against other children at school and banging his head into the wall. Cerise explained to the court that when the visit with K.B. was cancelled after Mother's November 30 arrest, K.B. "just curled up and -- into a ball, shut down."

¶6 Contact was stopped completely while Mother entered treatment through the Passages program at the Montana Women's Prison. Cerise facilitated a gradual reintroduction between Mother and K.B. beginning the following summer, first through letters and then in-person visits starting in July 2012. Although the first visits that summer went well, K.B.'s behavioral problems in the foster home again began to escalate in August. At the same time, Mother began missing her own individual therapy sessions and, on September 8, 2012, she was arrested again. Cerise testified that, after that arrest, K.B. had numerous "major meltdowns," both at home with his foster family and at school, including sustained fits of crying, throwing himself on the floor, and increased defiance at school. After this third arrest, Cerise recommended that visits be suspended until Mother could demonstrate sustained compliance with treatment and stability in her life.

¶7 Mother protested the termination of her visitation and argues on appeal that the Department made it impossible for her to complete her treatment plan, which required her to maintain and improve the parent-child bond. She argues that Cerise was punitive toward her, demanding "a hundred percent" perfection before she would be allowed contact with her child. She also argues that the District Court's failure to act on Mother's requests for court-ordered visitation with K.B. was an abuse of discretion and the refusal to allow contact constituted a constitutional violation of her right to parent.

¶8 We review a decision to terminate parental rights for abuse of discretion. *In re D.B.*, 2008 MT 272, ¶ 13, 345 Mont. 225, 190 P.3d 1072. We review a court's findings

of fact to determine whether they are clearly erroneous and its conclusions of law to determine whether they are correct. *In re T.S.*, 2013 MT 274, ¶ 21, 372 Mont. 79, 310 P.3d 538. We will not disturb a district court's decision on appeal unless "there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." *In re T.S.*, ¶ 21 (quoting *In re D.B.*, ¶ 17).

¶9 The District Court found that Mother had failed to complete her treatment plans: she had not addressed her chemical dependency issues or refrained from the use of mood altering chemicals; she did not successfully engage in individual counseling; she did not follow the recommendations of her neuropsychological evaluation or her violence risk assessment; she did not follow the conditions or restrictions ordered by the court in her criminal cases; she did not work cooperatively with the Department; and she was manipulative and dishonest with the professionals working with her. Mother does not challenge any of these findings, but points out the tasks that she did complete prior to the termination of visits with her son. Mother argues that the Department cut off whatever hope she had of progressing on her treatment plan when it simply denied her all contact with K.B. She argues that, because of the unrealistic standards of one counselor and the Department's obstinate support of that counselor over its statutory duties to make reasonable efforts at reunification, she was denied the opportunity to advance toward completion of her treatment plan and regain custody.

¶10 A district court may terminate the parent-child legal relationship if it finds by clear and convincing evidence that:

(f) the child is an adjudicated youth in need of care and both of the following exist:

> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

Section 41-3-609(1), MCA. "Section 41-3-423, MCA, obligates the Department to make 'reasonable efforts' to reunify families; however, the statute does not define the term and indeed it would be impossible to do so, as each case must be evaluated on its own facts." *In re K.L.*, 2014 MT 28, ¶ 41, 373 Mont. 421, 318 P.3d 691. Further, "[i]n determining preservation or reunification services to be provided and in making reasonable efforts at providing preservation or reunification services, the child's health and safety are of paramount concern." Section 41-3-423(1), MCA.

¶11 The discontinuation of visits between Mother and K.B. cannot be laid at the feet of "one counselor." In addition to his work with Cerise, K.B. also had two neuropsychological evaluations completed by Dr. Brenda Roche, the first in May 2012, after a series of sessions over several months, and the second in February and March 2013. Cerise and Dr. Roche diagnosed K.B. with various conditions, including Post Traumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, Sensory Processing Disorder, and Dysthymic Disorder, a depressive condition attributed to a series of events over time, as opposed to a single traumatic event. Both Cerise and Dr. Roche agreed that K.B. should have no more contact with Mother until he has permanency with his

prospective adoptive family. Roche told the court in May 2013 that K.B. had made significant progress during the year between his two evaluations, but that contact between K.B. and Mother at that time would harm their relationship, as Roche believed the child would completely regress. Roche stated that if K.B. were reunified with Mother and then she didn't make it, it would cause K.B. irreparable harm. Roche testified, "He could not take another disruption."

¶12 Mother was incarcerated at the time of the termination hearing and awaiting sentencing on felony drug charges, and her conditional release from a prior conviction had been revoked. The District Court, noting that K.B. was eight years old by the time its termination order was entered, made a finding that "K.B. cannot wait for S.B. to resolve her current legal problems." K.B. wanted to be adopted by his foster family and the District Court noted, "He has lived with them for nearly half of his life. He needs finality."

¶13 The goals of Mother's treatment plan were to address the factors that had made her unable to parent K.B. effectively: to provide a safe and stable environment for him, with parents who were not violent with each other and were free from the chemical abuse that led to their unfitness. Mother did not successfully complete any of the tasks in Phase I of her treatment plan and, although she completed a handful of the tasks in Phase II of the plan, she did not address her chemical dependency and abuse issues. She continued to violate her probation and to use narcotic drugs; her visits with K.B. were terminated due to her own behavior and the impact that it was having on him. We have observed many

7

times that "the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights." *In re E.K.*, 2001 MT 279, ¶ 33, 307 Mont. 328, 37 P.3d 690.

¶14 "[A] parent's likelihood of regaining fitness to parent is informed by her progress on the treatment plan after 'reasonable efforts' have been made to provide her with the tools to succeed." *In re K.L.*, ¶ 45 (J. Baker, dissenting). The Department provided Mother with chemical dependency evaluations, individual counseling, inpatient treatment, supervised visitations, social work case management, and other services. Despite these efforts, Mother did not cooperate with the professionals involved in her case and did not progress on key elements of her treatment plan. The District Court did not err in concluding that Mother's inability to respond to the negative impact of her behavior presented too great a risk to K.B. to advance toward reunification.

¶15 We have determined to decide this case pursuant to Section I, Paragraph 3(d) of our Internal Operating Rules, which provides for noncitable memorandum opinions. The record supports the District Court's factual findings. Its refusal to order the Department to compel visitation between Mother and K.B. was not an abuse of the court's discretion and it did not err in determining that clear and convincing evidence justified termination of Mother's parental rights.

¶16 Affirmed.

/S/ BETH BAKER

8

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JIM RICE